## UNITED STATES DISTRICT COURT
## FOR THE SOUTHERN DISTRICT OF NEW YORK

SECURITIES AND EXCHANGE COMMISSION,

                              Plaintiff,

v.

LAWRENCE ANTHONY DIMATTEO; VADIM
KOMISSAROV; LOTTERY.COM, INC.;
MATTHEW CLEMENSON; and RYAN
DICKINSON,

                              Defendants.

Civ. Action No. 1:26-cv-603

**JURY TRIAL DEMANDED**

## COMPLAINT

The Securities and Exchange Commission ("Commission") alleges as follows against Defendants Vadim Komissarov ("Komissarov"), Lawrence Anthony DiMatteo ("DiMatteo"), Lottery.com, Inc. ("Lottery"), Matthew Clemenson ("Clemenson"), and Ryan Dickinson ("Dickinson"):

1.      From November 2020 through May 2022, Komissarov, DiMatteo, Clemenson, and Dickinson engaged in a fraudulent scheme to mislead and defraud investors in Lottery, which was in the business of selling lottery tickets online, and Trident Acquisitions Corp. ("Trident"), a special purpose acquisition company ("SPAC") with which Lottery's predecessor/subsidiary merged in October 2021.  Komissarov, who was the Chief Executive Officer of Trident, planned and executed the scheme with DiMatteo (Lottery's co-founder and CEO), Clemenson (Lottery's other co-founder and Chief Revenue Officer), and Dickinson (Lottery's President and ultimately Chief Financial Officer) (collectively, "the Lottery executives").

1

2.      In November 2020, AutoLotto, Inc. d/b/a Lottery.com was a private company struggling to generate revenue when it was introduced to Komissarov, a sponsor of SPAC vehicles, including Trident.  For its part, Trident faced a regulatory deadline to complete a merger with a private company, such as Lottery.com.  If Trident failed to complete a merger by the deadline, Trident would be required to dissolve and return to investors over $60 million held in trust, and Komissarov stood to personally lose millions.  The individual Defendants discussed – and subsequently agreed – to merge Lottery.com into Trident, the SPAC, after which Trident would be renamed Lottery.com, Inc. which would be a public company.

3.      After the Lottery executives informed Komissarov of Lottery's dire financial condition, and that most of its anticipated revenue for 2020 was at risk, Komissarov planned and executed – with the participation of DiMatteo, Clemenson, and Dickinson – a phony $9 million transaction to falsely inflate Lottery's revenue.  The scam involved borrowed money and a series of escrow transfers whereby Lottery purportedly received $9 million for valueless customer data and then used that $9 million to overpay for two Mexican businesses and, thus, return the $9 million to its source.  Lottery's executives never intended to provide $9 million in goods or services and understood that they could not use the $9 million, but this did not stop the company from booking the revenue.  At Komissarov's direction, and with his participation, DiMatteo, Clemenson, and Dickinson executed the phony transactions, overstated the acquisition cost of the Mexican entities, and created documentation for Lottery's auditors to make both deals appear to be *bona fide*.

4.      Additionally, in the weeks before Trident merged with Lottery, at Komissarov's urging, the Lottery executives engaged in a second scam to falsely inflate Lottery's revenue – a $30 million sale of advertising credits – which DiMatteo touted to investors.  After Lottery became

a public company, DiMatteo, Clemenson, and Dickinson executed two additional bogus sales – totaling over $35 million – with the same complicit counterparty, and obtained an undisclosed $30 million line of credit to create the appearance that the counterparty had paid for the initial sale. These transactions caused Lottery to overstate its 2021 revenues by more than 300% and its revenues for the first quarter of 2022 by nearly 800%.

5.      In carrying out this scheme, Komissarov, DiMatteo, Clemenson, and Dickinson made – or aided and abetted the making of – material misrepresentations concerning Lottery's financial results, assets, and the growth of its business in Commission filings, press releases, and other public statements before and after the merger with Trident.  They did so to attract investors to Trident/Lottery, to convince Trident shareholders not to redeem their shares prior to the merger with Lottery, and to enrich themselves.  Komissarov also directed and participated in the deceitful conduct to avoid millions of dollars in personal losses if Trident failed to complete a merger and to attempt to bolster the stock price afterward.

6.   By engaging in the conduct described herein:

a.   Lottery, Komissarov, DiMatteo, Clemenson, and Dickinson violated the antifraud provisions of Sections 17(a) of the Securities Act of 1933 ("Securities Act") [15 U.S.C. § 77q(a)] and Section 10(b) and Rule 10b-5 of the Securities Exchange Act of 1934 ("Exchange Act") [15 U.S.C. § 78j(b) and 17 C.F.R. § 240.10b-5];

b.   DiMatteo, Clemenson, and Dickinson violated the internal controls and books and records provisions of Section 13(b)(5) of the Exchange Act [15 U.S.C. § 78m(b)(5)] and Exchange Act Rule 13b2-1 [17 C.F.R. § 240.13b2-1];

c.   DiMatteo and Dickinson violated the lying to accountants provision of Exchange Act Rule 13b2-2 [17 C.F.R. §240.13b2-2];

     d.   DiMatteo and Dickinson violated the certification provision of Exchange Act Rule 13a-14 [17 C.F.R. § 240.13a-14];

     e.   Komissarov, DiMatteo, Clemenson, and Dickinson violated the proxy provisions of Section 14(a) of the Exchange Act and Rule 14a-9 thereunder [15 U.S.C. § 78n(a) and 17 C.F.R. § 240.14a-9];

     f.   Lottery violated the reporting, books and records, internal controls, and proxy provisions of Sections 13(a), 13(b)(2)(A), 13(b)(2)(B), and 14(a) of the Exchange Act [15 U.S.C. §§ 78m(a), 78m(b)(2)(A)-(B), and 78n(a)] and Exchange Act Rules 12b-20, 13a-1, 13a-11, 13a-13, and 14a-9 [17 C.F.R. §§ 240.12b-20, 240.13a-1, 240.13a-11, 240.13a-13, and 240.14a-9]; and

     g.   DiMatteo, Clemenson, and Dickinson aided and abetted Lottery's violations of the antifraud provisions of Section 17(a) of the Securities Act [15 U.S.C. § 77q(a)] and Lottery's violations of the antifraud, reporting, books and records, internal controls, and proxy provisions of Sections 10(b), 13(a), 13(b)(2)(A), 13(b)(2)(B), and 14(a) of the Exchange Act [15 U.S.C. §§ 78j(b), 78m(a), 78m(b)(2)(A)-(B), and 78n(a)] and Exchange Act Rules 10b-5, 12b-20, 13a-1, 13a-11, 13a-13, and 14a-9 [17 C.F.R. §§ 240.10b-5, 240.12b-20, 240.13a-1, 240.13a-11, 240.13a-13, and 240.14a-9].

7.    The Commission seeks injunctive relief, disgorgement of ill-gotten gains, prejudgment interest, civil penalties, and other appropriate and necessary equitable relief. The Commission also seeks officer and director bars for Komissarov, DiMatteo, Clemenson and Dickinson.

## JURISDICTION AND VENUE

8.      This Court has jurisdiction over this action pursuant to Sections 20 and 22 of the Securities Act [15 U.S.C. §§ 77t and 77v] and Sections 21 and 27 of the Exchange Act [15 U.S.C. §§ 78u and 78aa].

9.      Venue is proper in this judicial district pursuant to Section 22 of the Securities Act [15 U.S.C. § 77v(a)] and Section 27 of the Exchange Act [15 U.S.C. § 78aa] because certain of the acts or transactions constituting violations alleged herein occurred in this judicial district.  In addition, Komissarov is an inhabitant of this district, and all Defendants transacted business here.

10.      Komissarov, DiMatteo, Clemenson, Dickinson, and Lottery, directly and indirectly, made use of the mails and of the means or instrumentalities of interstate commerce in connection with the acts, practices, and courses of business described in this Complaint.

## DEFENDANTS

11.      Vadim Komissarov, age 53, is a resident of New York, New York.  From June 1, 2018 through October 2021, Komissarov was the CFO and a director of Trident.  On November 18, 2020, Komissarov became the CEO of Trident, a position he held until the merger with Lottery on October 29, 2021.

12.      Lawrence Anthony DiMatteo, age 46, is a resident of Austin, Texas.  DiMatteo was a co-founder of the company that eventually became Lottery.  From 2015 through July 2022, DiMatteo was the CEO of Lottery and its predecessor entities.  DiMatteo asserted his Fifth Amendment rights and refused to answer substantive questions from SEC staff about the transactions and misrepresentations alleged herein.

13.      Matthew Clemenson, age 42, is a resident of San Francisco, California.  Clemenson was a co-founder of the company that eventually became Lottery.  From 2015 through July 2022,

Clemenson held various senior executive roles and, at the time of his resignation, was Lottery's Chief Revenue Officer.

14.     Ryan Dickinson, age 46, is a resident of Irvine, California.  Dickinson was employed by Lottery and its predecessor from September 2018 through July 2022.  Dickinson was employed in various executive roles and, at the time of his termination, was Lottery's President, Treasurer, and CFO.

15.     Lottery is a Delaware corporation with its principal executive offices in Fort Worth, Texas.  In 2015, DiMatteo and Clemenson founded and operated AutoLotto, Inc., which did business under the name "Lottery.com." In October 2021, AutoLotto, Inc. merged with a subsidiary of Trident Acquisition Corporation ("Trident"), a blank check or SPAC that went public via an initial public offering ("IPO") on June 1, 2018, with shares listed and traded on the Nasdaq Capital Market under the symbol "TDAC."  When the October 2021 merger occurred, Trident re-named itself Lottery.com, Inc.  and changed its ticker symbol to "LTRY."  Until July 2022, Lottery was primarily in the business of selling lottery tickets online through applications the company developed.  In or around August 2022, Lottery furloughed most employees and ceased core operations.  Lottery's common stock is registered with the Commission pursuant to Exchange Act Section 12(b) and currently trades on Nasdaq under the ticker symbol "SEGG."

## FACTS

16.     From its IPO and related offerings in 2018, Trident raised over $205 million. Trident had no operations and, as a SPAC, Trident sought a private entity with which to merge, thereby making the private entity a publicly traded company.  From June 2018 through early 2020, Trident unsuccessfully attempted to find a merger candidate in the oil and gas business.  In early 2020, Trident changed its focus to clean energy, but again was unsuccessful.  On three occasions

prior to November 2020, Trident required – and obtained – shareholder approval to extend the time for concluding a business combination.  As a result of the delays and extensions, Trident shareholders had the ability to redeem their shares for cash from the trust containing the proceeds of the IPO, and many shareholders did.  These redemptions significantly reduced the amount in the trust.  When the merger occurred in October 2021, Trident had only about $63.5 million in the trust.

17.    By November 2020, Trident faced a looming deadline to complete a business combination under regulatory rules.  If Trident failed to find a target company and complete a merger (or further extend the deadline), Trident would have to liquidate and return to investors the money held in trust.  If this occurred, Komissarov and Trident's other founders – who owned some of Trident's stock, had funded Trident's search for merger candidates and related due diligence activities, and had loaned money to Trident – would incur significant losses.  As explained in Trident's pre-merger Proxy statement, "the beneficial ownership of the Initial Stockholders (which include all of [Trident's] directors and officers) of an aggregate of 6,181,250 shares of Common Stock . . .  would become worthless if [Trident] does not complete a business combination within the applicable time period, as the Initial Stockholders have waived any right to redemption with respect to these shares."  Komissarov beneficially owned approximately 200,000 shares, which were valued at over $2 million prior to the merger based upon the market price of Trident's stock.

18.    Further, if Trident did not complete a merger, its directors, including Komissarov, would not receive reimbursement for certain expenses incurred by them on Trident's behalf. Komissarov had provided more than $1.4 million for such expenses.  Komissarov's associates stood to lose millions more.

### *Komissarov Met Lottery and Devised a Scheme to*
### *Falsely Inflate Lottery's Financial Results*

19.     In or around early November 2020, facing the looming merger deadline and the prospect of liquidating Trident, Trident's founders, including Komissarov, were introduced to DiMatteo and Clemenson.  At the time, Lottery was bordering on insolvency and seeking new investment capital to stay afloat.  During the first half of 2020, Lottery had hired additional staff to expand its operations.  However, as the year progressed, Lottery failed to increase revenues substantially and, by September 2020, was having difficulty making payroll.  Prior to meeting Komissarov and the other Trident founders, Lottery was floundering financially, and its biggest source of projected revenue was a company that itself lacked funding.

20.     After the introduction, DiMatteo provided Lottery's unaudited financial statements and projections to Komissarov and others at Trident.  During negotiations in November 2020, DiMatteo, Clemenson, and Dickinson informed Komissarov and other Trident founders that Lottery needed money to continue operations and that, although Lottery's projections showed over $17 million in anticipated revenue for the year ending December 31, 2020, most of that revenue was at risk.  They informed Komissarov that Lottery had expected a business partner, Company A, to provide $1 million of revenue per month, but Lottery had not received any revenue from Company A for over eight months.

21.     Komissarov, who had significant financial incentives to complete a merger, told the Lottery executives that he could help with the lack of revenue.  Komissarov also informed the Lottery executives that, to generate investor interest and close a merger, Trident and Lottery would need to convince investors that Lottery's business and revenues were growing quickly quarter-over-quarter.  Lottery's executives, who were desperate for capital and had no prior experience as

officers of a public company or taking a company public, accepted Komissarov's representations and guidance wholesale.

22.     Beginning in mid-December 2020, Komissarov devised – and communicated to the Lottery executives – a scheme to attract investor interest in Lottery by creating a façade of revenue and asset growth.  The Lottery executives had no experience dealing with SPACs or preparing financial statements in conformance with GAAP and relied heavily on Komissarov. DiMatteo, Clemenson, and Dickinson discussed Komissarov's plan, whether it would work, and the steps they would take to execute it – and, in late December 2020, agreed to proceed.  They followed Komissarov's plans and instructions, described below, because they saw a merger with Trident as a lifeline for their struggling private company and its investors.

23.     To carry out this fraud, and the subsequent sham transactions, the individual defendants communicated primarily through a private messaging app that was purposefully set to automatically delete their messages after a short period of time.  They did so to avoid creating a record of their communications.

24.     Komissarov's scheme initially had three primary components: 1) creating false revenue for Lottery; 2) spreading out that revenue over several quarters to create the appearance of rapid, consistent growth for Lottery; and 3) "spending" the fictious cash from the phony revenue to inflate Lottery's value.  As detailed below, Komissarov borrowed money for a false revenue transaction and arranged for the funds to be transferred among various parties to create the false appearance of a payment for an actual sale.  Komissarov then advised the Lottery executives on re-structuring the phony sale to spread the revenue over three quarters.  At the same time, Komissarov directed the Lottery executives to pursue an acquisition, using a

middleman (i.e., an entity Komissarov identified) to inflate the purchase price – which Lottery "paid" by returning the borrowed funds to the middleman.

25.     In or around mid-December 2020, Komissarov detailed to the Lottery executives how Lottery could generate fake revenue with a compliant counterparty. Komissarov said that an acquaintance, identified as "M.I.", had $9 million in escrow and would allow Komissarov to borrow it for 30 days. Komissarov outlined how the money could be loaned to Company A, which would enter into a phony purchase agreement with Lottery and then transfer the borrowed money to Lottery as payment. Lottery would record the transaction, hold the money in escrow at year-end to create the appearance of having an additional $9 million in cash/assets, and then return the money to M.I. in January 2021. Lottery would also claim that its return of the money was a cash payment toward an acquisition.

26.     In short, Komissarov's plan involved a circular transfer of money for a sham transaction that had no economic substance. At the time he conceived and – with the assistance of DiMatteo, Clemenson, and Dickinson – executed the plan. Komissarov, DiMatteo, Clemenson, and Dickinson knew, or was reckless in not knowing, that the money transfers would create a false appearance: that a customer had paid $9 million to Lottery for data/services and that Lottery then used the $9 million to acquire assets of similar value. In carrying out the scheme, Komissarov, DiMatteo, Clemenson, and Dickinson sought to deceive investors about Lottery's financial status so they could complete the business combination and minimize shareholder redemptions from the Trident SPAC.

### *Round-trip Transaction with Company A: Creating False Revenue Using Borrowed Money in an Escrow Account and Spending the Fictious Revenue on an Acquisition at an Inflated Price*

27.     Per Komissarov's instructions, in December 2020, Clemenson arranged for Company A to send a Statement of Work for a $9 million purchase from Lottery. This document

was a sham because Company A did not have $9 million, nor did it intend to obtain goods or services from Lottery.  At the time, Komissarov, DiMatteo, Clemenson, and Dickinson knew, or were reckless in not knowing, that Lottery was not engaging in a genuine sale, but was merely creating the appearance of a transaction to generate fake revenue.

28.     In or around late December 2020, Komissarov informed the Lottery executives that M.I.'s money was in an escrow account at a law firm in Massachusetts ("Law Firm").  Komissarov also told Lottery executives that M.I. agreed to loan the money on the condition that it had to remain in the escrow account.  Neither Lottery nor Company A could withdraw or use the money.

29.     Komissarov directed the Lottery executives to have Lottery and Company A enter into escrow agreements with the Law Firm to facilitate the money transfers.  These transfers were simply bookkeeping entries in the Law Firm's escrow records supported by transfer instructions from the lender, Company A, and Lottery.  At the time that Komissarov directed the transfers, he knew, or was reckless in not knowing, that Company A and Lottery were not engaging in a legitimate business transaction.

30.     In or around late December 2020, DiMatteo and Clemenson discussed the purpose of the escrow arrangement, and, on December 24, 2020, they each signed the corporate resolution authorizing Lottery to enter into an Escrow Agreement with the Law Firm.  At the time, DiMatteo and Clemenson knew, or was reckless in not knowing, that the purpose of using the escrow account was to conceal that the sale to Company A was bogus, that Lottery would not provide $9 million of goods or services to Company A, and that Lottery would not actually receive or be able to use the $9 million.

31.    On December 27, 2020, the Law Firm's principal emailed a "draft escrow disbursement request" even though, at the time, Lottery had no money in the escrow account. The disbursement request, which Komissarov drafted or was involved in drafting, was for $9 million to be transferred from Lottery to M.I.  The following day, prior to Lottery being credited with any money, Clemenson signed the instructions.  In effect, before the round-trip transfer of money had begun, Lottery agreed to return the money.

32.    On December 29, 2020, the Law Firm's principal confirmed "receipt of $9 million into the [Lottery] escrow account" and conveyed an account statement, showing a "Transfer to [Lottery], per [Company A's] instructions."  Subsequently, in its financial statements for 2020, which Lottery provided to its auditor and investors, Lottery included $8.95 million held in escrow at the Law Firm (the $9 million minus a $50,000 fee), thereby materially overstating its assets and cash holdings.  At the time, Komissarov, DiMatteo, Clemenson, and Dickinson knew, or were reckless in not knowing, that the $8.95 million was borrowed money that Lottery did not control.

33.    On January 25, 2021, at Komissarov's direction, Clemenson sent escrow transfer instructions to the Law Firm, directing that $9 million be transferred to an entity identified by Komissarov.  Per Komissarov's plan, Lottery claimed that this transfer was a partial payment for an acquisition of 80% ownership of two Mexican entities.  Clemenson and Dickinson have since acknowledged that the partial payment was a ruse – a cover story to return the borrowed money to its source.

34.    Komissarov, DiMatteo, Clemenson, and Dickinson knew, or were reckless in not knowing, that the transaction and transfers were phony and that the disclosures of this false information would mislead investors and Lottery's auditor about the company's financial results

and revenue growth.  Nevertheless, Komissarov included Lottery's misstated financial results and the inflated cost of the acquisition in a Registration Statement on Form S-4 that Trident filed with the Commission on July 6, 2021 (and that Komissarov signed), in other amended Form S-4 filings with the Commission, and in Trident's Proxy Statement/Prospectus filed with the Commission on October 18, 2021.  For their part, under the Merger Agreement executed with Trident in February 2021, Lottery was responsible for providing information for Trident's Registration Statement, Proxy Statement, and other filings that did not contain any untrue or misleading statements.  The Lottery executives provided or allowed the false information to be provided to Trident for inclusion in the filings.  Further, the Lottery executives and Komissarov knew that their names would be used in Trident's Proxy Statement/Prospectus filed with the Commission and sent to Trident's shareholders.

### Revising the Statement of Work to Spread Out the Phony Revenue from the Round-trip Transaction with Company A

35.    The Statement of Work that Company A sent to Lottery in December 2020 for a $9 million purchase did not include any time periods for performance and, thus, created uncertainty as to when Lottery could recognize revenue for the "sale."  In or around early January 2021, Komissarov told the Lottery executives that the phony revenue should be spread across three quarters to show consistent growth and instructed them to create a new Statement of Work indicating that $2 million of goods/services were provided in late 2020, $2 million would be provided in the first quarter of 2021, and the remaining $5 million performance obligation would occur in the second quarter of 2021.

36.    In February 2021, the Lottery executives created a new Statement of Work and communicated with Company A about the modifications.  Consistent with Komissarov's instructions, the new Statement of Work set performance periods to spread the revenue across

three financial quarters and was back-dated to December 2020.  The revised Statement of Work contained the same $9 million purchase price, even though Lottery had not, and would not, provide goods and services to Company A, which did not have the ability to pay.  To have proof of delivery for an audit, Lottery sent a USB drive containing worthless data to an address in Eastern Europe provided by Komissarov.  Neither Lottery nor Company A performed any obligations under the original or new Statements of Work, nor did they exchange anything of more than minimal value pursuant to those agreements.

37.     Per Komissarov's plan, for its year-end 2020 financial statements, Lottery recorded the $9 million transaction and cash "payment," and recognized $2 million in revenue for partial performance of the transaction with Company A, which increased Lottery's revenue for 2020 by over 36%.  Lottery classified the remaining $7 million as deferred revenue, *i.e.*, payment received for goods/services not yet provided.  Lottery recognized the deferred revenue in its first quarter of 2021 ($2 million) and second quarter of 2021 ($5 million), thereby falsely inflating Lottery's financial results in those two quarters by at least 57%, and at least 90%, respectively.

### *The Return of the Borrowed Funds, the Middleman, and the Mexican Acquisitions to Spend the Fictious Money from the Round-trip Transaction with Company A*

38.     In early 2021, Lottery – directed by Komissarov and with the knowledge and participation of DiMatteo, Dickinson, and Clemenson – had accomplished two of the scheme's three prongs.  Lottery, through the sham sale to Company A, had fabricated $9 million in phony revenue, and had generated paperwork to create the appearance that this revenue was spread over several quarters.  Problems remained, however: if Lottery was going to merge with Trident, Lottery would be audited and would need to explain what happened to the $9 million in cash it claimed to receive from the bogus sale.  Komissarov also needed to return the actual $9 million

used in the scheme from the Law Firm's escrow accounts back to the lender.  The solution to these problems was another bogus transaction – the acquisition of two Mexican lottery companies, at sham prices, that allowed Lottery to "spend" the fake sale proceeds and that allowed Komissarov to return the cash to the lender.

39.     During the previous month, the Lottery executives received confirmation that Lottery could acquire 80% or 90% of the Mexican entities for about $1 million.  Komissarov told Clemenson that the Mexican entities could be "worth" any amount and that a third-party could purchase the entities and then sell them to Lottery at an artificially higher price.

40.     Rather than Lottery acquiring the Mexican entities in a direct purchase, Komissarov arranged for an entity in the Czech Republic ("Czech Company") to act as a middleman by entering into an agreement to acquire the Mexican entities for about $1 million.  The Czech Company would then effectively sell the Mexican entities to Lottery for $10.5 million cash and hundreds of thousands of shares of stock.  But Lottery would not actually pay $10.5 million.  Instead, Lottery returned the $9 million in borrowed funds in the escrow account as partial payment to the Czech Company, as directed by Komissarov.  Prior to participating in the scheme, DiMatteo, Clemenson, and Dickinson discussed Komissarov's plan, and all agreed to proceed.

41.     On January 25, 2021, at Komissarov's direction, Clemenson sent escrow transfer instructions to the Law Firm, directing that $9 million be transferred to the Czech Company's "escrow account administered by [Law Firm]."  The instructions also "requested that [M.I.] approves [sic] the revocation of the previous request and this new request by signing in the space provided below."

42.    Based on information and belief, around the same time, Komissarov arranged for the loaned money to be returned through Company B, an entity in Las Vegas, Nevada.  Company B was controlled by an associate of one of Trident's directors.

43.    On January 26, 2021, the Law Firm wired $8.95 million from the escrow account to Company B's account at a bank in Las Vegas.  Based upon information and belief, the $8.95 million wired to Company B was the money that Komissarov had arranged as a loan for purposes of the phony revenue transaction described above in paragraphs 27 through 33 – minus a $50,000 fee paid to the Law Firm.

### Komissarov Adopted a Pseudonym to Conceal His Identity

44.    In or around late January 2021, Komissarov identified a Mexican Attorney to represent both the Czech Company and Lottery in the acquisition of the Mexican entities.  The Lottery executives agreed – and informed the Mexican Attorney – that Lottery would pay the legal fees for both the Czech Company and Lottery.  The Czech Company identified "Vlad" (no last name) as its "representative in North America" to negotiate on its behalf.

45.    "Vlad" was actually Komissarov.  Because he was the CEO of Trident and was engaging in a scam to inflate Lottery's financial results and perceived value, Komissarov sought to conceal his identity by adopting a pseudonym.  As "Vlad," Komissarov participated in Zoom calls and other communications to facilitate agreements for the Czech Company to acquire the Mexican entities and then to "sell" those entities to Lottery at the inflated price.  DiMatteo, Clemenson, and Dickinson knew that "Vlad" was Komissarov.  In fact, the Lottery executives never met or communicated in person with anyone from the Czech Company.  All substantive interactions with and involving the Czech Company were handled by Komissarov acting as "Vlad."

46.     On March 16, 2021, "Vlad" emailed Clemenson two executed letters of intent for the Czech Company to acquire 80% of both Mexican entities for a combined $1.03 million.

47.     On April 2, 2021, Lottery and the Czech Company signed a Share Purchase Agreement, under which Lottery agreed to acquire the 80% ownership interest in both Mexican entities for $10,530,000 cash "plus 228,702 shares of Lottery.com, corresponding to 2.667% of the total outstanding shares of Lottery.com as of April 2, 2021."  The amounts in this Agreement were the same as the final terms that Trident disclosed in a Commission filing in September 2021, though earlier Trident filings asserted that the "initial" consideration was just under $10 million.

48.     In effect, rather than Lottery purchasing the 80% ownership interest in the Mexican entities directly from their owners for about $1 million, Komissarov – with the assistance and knowledge of the Lottery's executives – arranged for the Czech Company to purchase the Mexican assets and then sell them to Lottery at a huge mark-up.  Lottery did not pay $10.53 million in cash, as claimed in Trident's filings with the Commission; instead, prior to Trident's merger with Lottery, Lottery issued 228,702 shares of pre-merger stock to the Czech Company, as directed by Komissarov.  Based upon information and belief, Lottery issued the stock to compensate Komissarov's associates for lending the $9 million for the phony deal with Company A and for acting as the middleman in the acquisition of the Mexican entities.

49.     Based on information and belief, in or around June 2021, Komissarov arranged for a new entity, Company C, to be created, after which Komissarov directed that the Czech Company's right to obtain the 80% interest in the Mexican entities be transferred to Company C.

50.     On June 30, 2021, Lottery paid $1.03 million to the owners of the Mexican entities through the Law Firm's escrow account.  Based on information and belief, the Czech Company

never paid anything for the Mexican entities and in effect transferred to Lottery its ability to acquire those entities.

51.    On July 6, 2021, Trident filed a Form S-4 with the Commission, which Komissarov signed as CEO of Trident.  In that filing, Trident stated that Lottery had acquired 80% ownership of the Mexican entities by purchasing Company C for total initial consideration of $9.9 million that "includes $9.4 million in cash and approximately $0.5 million in stock consideration (228,702 shares at Lottery.com's stock price of $2.01 per share)."

52.    At the time he signed the Form S-4, Komissarov knew, or was reckless in not knowing, that the representations about Lottery's purchase of 80% of the Mexican entities for over $9 million in cash and stock were false and misleading because Lottery did not have – and had not paid – over $9 million in cash for the acquisition.  Moreover, the misrepresentations led investors to believe that Lottery had acquired a controlling interest in entities that were worth about $10 million, when the realistic value of those entities, as reflected by the amount actually paid, was about $1 million.

53.    At the time that he signed the Form S-4 filing, Komissarov knew, or was reckless in not knowing, that Lottery actually paid $1.03 million in total consideration to the Mexican entities and that Lottery had agreed to issue the 228,702 shares of stock to an entity that Komissarov designated.

54.    Based upon information and belief, shortly before the Trident-Lottery merger in October 2021, Komissarov directed Lottery to issue the 228,702 shares to the Czech Company. When the Trident-Lottery merger occurred, the 228,702 shares of non-public Lottery stock converted to 687,439 shares of publicly tradable Lottery stock, which was restricted from sale for six months.

55.     In April 2022, prior to the stock becoming unrestricted, Komissarov arranged for the 687,439 shares issued to the Czech Company to be transferred to a newly created entity, Company D, which had been established and was controlled by the principal of the Law Firm through which Komissarov had cycled the $9 million loan for the phony revenue transaction in late 2020/early 2021.  Based upon information and belief, at Komissarov's direction, the principal of Law Firm sold approximately 480,000 shares of Lottery stock in May 2022, for total proceeds of over $665,000.

56.     Komissarov knew, or was reckless in not knowing, that his conduct in connection with these schemes was unlawful.  In a phone call with Clemenson and Dickinson recorded by the FBI, Komissarov acknowledged "if Trident and me specifically knew about [the Company A-Mexico transactions], then, then I'm in deep, deep, deep, deep water."

### Material Misstatements in Trident's Commission Filings and Press Releases Related to the Round-trip Transaction with Company A

57.     To present the merger to Trident's shareholders for approval and to solicit investors, Trident made a series of public filings with the Commission in 2021, typically signed by Komissarov and with the knowledge of the Lottery executives, who were responsible for supplying information about Lottery to Trident that did not contain any untrue statements of a material fact. As a result of the sham transactions discussed above – which Komissarov directed and DiMatteo, Clemenson, and Dickinson participated in – these filings were materially misleading in several key ways.  As described below, the filings (a) overstated Lottery's revenue and revenue growth; (b) minimized Lottery's actual losses (negative net income); and (c) falsely characterized Lottery's purchase of the Mexican entities, which impacted the value of those entities and inflated Lottery's assets.

58.     For example, on July 6, 2021, Trident filed a Form S-4 with the Commission, which Komissarov signed as CEO of Trident.  At the time Komissarov signed and authorized the filing of the Form S-4, Komissarov, DiMatteo, Clemenson, and Dickinson knew, or were reckless in not knowing, that information supplied by Lottery that Trident included in the filing was materially false concerning Lottery's financial results and the initial consideration paid for the Mexican entities.  Specifically, the Form S-4 indicated that:

    a.  Lottery's annual revenue for 2020 was $7.46 million based on audited financial statements.  At the time, Komissarov, DiMatteo, Clemenson, and Dickinson knew, or were reckless in not knowing, that this figure was inflated by $2 million – or over 36% – because of the phony revenue transaction involving Company A.

    b.  Lottery's unaudited revenue for the first quarter of 2021 was $5.46 million.  At the time, Komissarov, DiMatteo, Clemenson, and Dickinson knew, or were reckless in not knowing, that this figure was also inflated by $2 million – or over 57% – because of the phony revenue transaction involving Company A.

    c.  Lottery had acquired 80% ownership of the Mexican entities by purchasing Company C for total initial consideration of $9.9 million that "includes $9.4 million in cash and approximately $0.5 million in stock consideration (228,702 shares at Lottery.com's stock price of $2.01 per share)." At the time, Komissarov, DiMatteo, Clemenson, and Dickinson knew, or were reckless in not knowing, that Lottery had paid only $1.03 million to acquire the 80% ownership stakes.

59.     Subsequent, amended Forms S-4 filed on August 12, 2021, September 17, 2021, and October 5, 2021, were signed by Komissarov and contained similar material misstatements about Lottery's revenue and the costs of acquiring the Mexican entities.  DiMatteo, Clemenson,

and Dickinson provided or directed the provision of the information concerning Lottery's financial results and the Mexican acquisitions that was included in these amended Forms S-4, and knew, or were reckless in not knowing, that the information was materially false and misleading.

60.     On August 2, 2021, Lottery and Trident issued a press release with Lottery's preliminary results for revenue for Q2 FY 2021.  Trident also filed a Form 8-K with the Commission, signed by Komissarov, attaching the release and including it by reference.  In the release, Lottery announced that, preliminarily, revenue for the quarter was expected to be "between $9.1 million and $9.6 million on a reported basis" and that Lottery's "sequential revenue growth averaged approximately 87% per quarter, and the Company expects to achieve similar average growth in the near term." The release also quoted DiMatteo: "Our revenue in the first half of the year is tracking ahead of our internal estimates, and . . . we are forecasting strong sequential growth in the second half of 2021."

61.     At the time of the press release of August 2, 2021, Komissarov and DiMatteo knew, or were reckless in not knowing, that the release contained materially false and misleading statements, particularly:

    a.  Lottery's revenue estimate of $9.1 million to $9.6 million was more than twice the amount of Lottery's actual revenue because it included $5 million of fake, deferred revenue from the phony transaction with Company A that Lottery recognized in the second quarter of 2021.

    b.  Lottery's sequential quarterly revenue growth was, at best, a fraction of 87% because Lottery included fake revenue in three consecutive quarters because of the deal with Company A.

    c.   Lottery could not legitimately meet its growth forecasts because the company was struggling to grow its core business, *i.e.*, online sales of lottery tickets.  Having engaged in phony transactions to support the inflated numbers from past quarters, Lottery would need similar, sham transactions to meet the forecast for "strong sequential growth in the second half of 2021."

62.    DiMatteo also knew, or was reckless in not knowing, that his statement in the press release about Lottery's revenue "tracking ahead of our internal estimates" was false because nearly half of Lottery's revenue for the first half of 2021 was fabricated.

63.    On October 18, 2021, Trident filed a Proxy Statement/Prospectus with the Commission that was also mailed to Trident's stockholders.  The purpose of the filing was, in part, to provide Trident shareholders with information about the potential business combination with Lottery so that they could vote on the merger and/or decide whether to redeem their shares prior to the merger.  As noted in the filing, Trident's shareholders could redeem their shares for approximately $10.94 per share, which was 9.4% higher than the IPO price.

64.    As with Trident's Form S-4 and amendments thereto, the Proxy Statement/Prospectus contained materially false and misleading statements about Lottery's financial results and the total price of the Mexican acquisitions.  The misrepresentations were the same as those contained in the amended Forms S-4 filed with the Commission on September 17, 2021, and October 5, 2021.  Komissarov was involved in drafting, editing, and reviewing the Prospectus/Proxy and he approved its filing with the Commission.  At the time, Komissarov knew or was reckless in not knowing about the materially false statements in the Proxy Statement/Prospectus.  DiMatteo, Clemenson, and Dickinson knew or were reckless in not knowing that the financial results and the cost of the Mexican acquisitions, which Lottery supplied

to Trident for the Proxy Statement/Prospectus, were materially false.  Komissarov and the Lottery executives also knew that their names were being used in the Proxy Statement/Prospectus.

65.    As to the Lottery executives, the Proxy Statement/Prospectus included detailed biographies of DiMatteo, Clemenson, and Dickinson, noting their experience in management, other qualifications, and that DiMatteo and Clemenson had been "at the forefront of developing innovative online products and blockchain solutions and establishing strategic partnerships with market participants throughout their careers."  The Proxy Statement/Prospectus also included a detailed history of Lottery; its management's discussion and analysis of Lottery's financial condition and results of operations; and explained that DiMatteo, Clemenson, and Dickinson would lead the combined company if the merger occurred.

66.    On October 21, 2021, Trident and Lottery issued a press release announcing Lottery's "strong preliminary third quarter 2021 revenues" with an expected range of $22 million to $24 million.  DiMatteo, quoted in this press release, touted these "strong" results.  Komissarov, DiMatteo, Clemenson, and Dickinson knew, or were reckless in not knowing, that the release contained material misstatements about Lottery's expected revenue and quarterly sequential revenue growth.  Specifically, the bulk of the revenue was from a phony transaction that Lottery entered into on September 30, 2021, described further below.

### In Early 2021, Komissarov Established Aggressive Revenue Projections and, as Part of the Scheme to Defraud, Directed the Lottery Executives to Achieve Them by Engaging in Phony Transactions

67.    As Komissarov directed and, with the assistance of others, executed the initial phony revenue transactions involving Company A and the Mexican entities in the early months of 2021, he stressed to DiMatteo, Clemenson, and Dickinson the need to show that Lottery had a

rapidly growing business and that revenues were increasing at double-digit rates to attract investors and complete the merger.

68.    In or around early 2021, Komissarov directed the development of Lottery's financial projections – with a particular emphasis on revenue growth – and targeted $71 million for Lottery's projected revenue in FY2021.  Throughout 2021, Komissarov communicated almost daily with DiMatteo, Clemenson, and/or Dickinson.  Those communications were on a platform that would erase messages after a set number of hours so there would be no records.

69.    In regular communications from at least March 2021 through the date of the merger, Komissarov repeatedly told the Lottery executives that, unless they showed growth toward the $71 million revenue target for 2021, the merger would be at risk.

70.    In March 2021, Komissarov participated in Lottery's preparation of an investor presentation, which Trident and Lottery used in meetings with investors.  The investor presentation included the $71 million revenue projection for FY 2021.

71.    In filings with the Commission, Trident represented that Lottery's revenue (unaudited) for the first half of 2021 was approximately $14.78 million, though this was nearly double the amount of actual revenue because of the phony transaction with Company A. Regardless, to meet annual revenue projections that Komissarov had insisted upon, Lottery needed at least $56 million in revenue in the second half of 2021.

72.    During September 2021 (the final month of Q3 FY 2021), Lottery's quarterly revenue was far below projections and, if accurately reported, would show negative growth rather than the "strong sequential growth" that DiMatteo had announced the prior month.  With the merger scheduled for the following month, Komissarov encouraged Lottery to engage in yet another phony transaction to substantially increase reported revenue for Q3 FY 2021.

***Round-trip Transaction with Company E: Lottery Engaged in a Fraudulent Transaction at the
End of the Third Quarter to Artificially Inflate its Financial Results Prior to the Merger—and
Continued to Book Phony Revenue as a Public Company***

73.     When the Merger Agreement was signed in February 2021, the Lottery executives
had doubled their annual salaries – from $250,000 to $500,000.  The higher salaries – and the
prospect of owning millions of shares of publicly traded stock – were powerful incentives to follow
Komissarov's directions both before and after the merger.

74.     As the merger date approached, the individual Defendants were motivated to close
the deal and to prop up Lottery's share price afterward.  Under the Merger Agreement, Komissarov,
Trident's other founders, and the Lottery executives could receive additional "earnout" shares if
Lottery's stock price achieved specific thresholds after the merger.  Specifically, the holders of pre-
merger Lottery stock could receive up to 6,000,000 additional shares of common stock if the dollar
volume-weighted average price of Lottery stock equaled or exceeded $13 per share for 20 of any
30 consecutive trading days after the merger.  Komissarov and Trident's two other founders could
receive up to 4,000,000 additional shares.  The merger agreement contained similar provisions if
certain thresholds were achieved in 2022.

75.     In or around late September 2021, Lottery sought to meet Komissarov's aggressive
revenue projections and DiMatteo's forecast of strong sequential revenue growth.  Motivated by
economic incentives to encourage Trident investors not to sell or redeem their shares prior to the
merger and, after the merger, to prop up Lottery's share price, the Lottery executives engaged in
phony transactions with Company E, which had connections to Company A.  In three separate
deals, Company E entered into agreements with Lottery in which it pretended to buy assets and
services from Lottery at inflated prices.  In reality, Company E bought virtually nothing.  Instead,
in an initial transaction, Lottery itself provided Company E with the money to make the transaction

appear to be legitimate, using a line of credit that Lottery obtained from the proceeds of its merger with Trident.  As Komissarov and the Lottery executives planned, these fake sales allowed Lottery to report tens of millions of dollars of revenue that did not exist.

76.    In September 2021, Lottery engaged in the first sham transaction with Company E. On September 30, 2021, Dickinson executed an agreement for Company E to purchase $10 million of pre-paid advertising credits Lottery owned for $30 million, with payment due in 90 days. Lottery had obtained these credits years earlier, as investments from two media companies.  The Lottery executives knew, or were reckless in not knowing, that the credits were not freely transferrable and had restrictions on usage, *e.g.*, the credits had to be used to promote Lottery. Regardless, even if the credits could be used by and transferred to a third party, there was no justification for charging $30 million for $10 million worth of credits.

77.    Lottery recorded the transaction as a *bona fide* sale and recognized the entire $30 million as revenue in the third quarter of 2021.  DiMatteo, Dickinson, and Clemenson knew, or were reckless in not knowing, that no assets were actually re-titled or transferred to Company E and, moreover, that Company E was trying to raise capital and did not have $30 million.

78.    On October 21, 2021 (eight days before the merger), Lottery and Trident issued a press release, which Trident filed with the Commission, touting Lottery's "Strong Preliminary Third Quarter 2021" and "Quarterly Sequential Growth of Greater than 135%."  The claimed revenue and growth were entirely attributable to the phony transaction of September 30, 2021.

79.    On November 15, 2021, Lottery issued an earnings release for Q3 FY 2021, highlighting Q3 FY 2021 revenue of $32.2 million and net income of $11.2 million.  The bogus transaction with Company E represented $30 million – or 93% – of the reported revenue and turned a multi-million-dollar loss into an $11.2 million "profit." In the release, DiMatteo expressed pride

about the "strong revenue and profitability growth we achieved in the third quarter" and indicated that Lottery would use its (fictitious) profits to continue growing its business. The release also noted that Lottery "expects to meet or exceed its previous guidance of $71 million for full year 2021 revenue."

80.    At the time he made or authorized the making of the statements in the earnings release, DiMatteo knew, or was reckless in not knowing, that Lottery's third quarter results were largely based on the $30 million "sale" to Company E and that Lottery did not have any profit in the third quarter. DiMatteo also knew, or was reckless in not knowing, that Lottery's core business was not generating substantial growth and that achieving $71 million in revenue for the year was unrealistic unless Lottery generated additional sham revenue.

81.    On November 18, 2021, Lottery filed a Form S-1 with the Commission to register millions of additional shares of common stock. The Form S-1, signed by DiMatteo, Clemenson, and Dickinson, included Lottery's unaudited financial results for first three quarters of 2021, which included $7 million of revenue from the phony transaction with Company A and $30 million of revenue from the sham sale of advertising credits to Company E. At the time that Lottery filed the Form S-1, DiMatteo, Clemenson, and Dickinson knew, or were reckless in not knowing, that the filing contained materially false and misleading statements about Lottery's revenue and other financial metrics, including net income, because they were involved in or oversaw the phony transactions and had intentionally sought to inflate Lottery's financial results in concert with Komissarov.

***Lottery Obtained a Line of Credit, which DiMatteo, Clemenson, and Dickinson Used to Create the Appearance that Company E Paid $30 Million to Lottery for the Round-trip Transaction***

82.    For the advertising credits purchased on September 30, 2021, Company E was required to pay $30 million to Lottery by year end. However, Company E did not have $30 million

– or anything close to it.  Komissarov, DiMatteo, Clemenson, and Dickinson understood that, because the transaction represented more than half of Lottery's year-to-date revenue, Lottery's auditors would likely question the validity of the transaction if the money was not paid.

83.    During Q4 FY 2021, the Lottery executives informed Komissarov that Company E did not have the money and sought his assistance in obtaining funding for Company E.  Although Komissarov attempted to identify funding options, the Lottery executives decided to obtain a loan – more specifically, a line of credit – to create the appearance that Lottery was paid $30 million at the end of December 2021.

84.    On or around December 30, 2021, Dickinson, with the knowledge and approval of DiMatteo and Clemenson, applied for a $30 million line of credit for Lottery, using $30 million of cash from the merger as collateral.  DiMatteo, Clemenson, and Dickinson did not inform Lottery's outside directors, Chief Legal Officer, or auditor about the line of credit.  Instead, they intentionally concealed its existence to create the appearance that Lottery had received $30 million from Company E as payment for the transaction of September 30, 2021.

85.    The line of credit did not make financial sense for Lottery and served no legitimate business purpose.  To obtain it, Lottery had to maintain $30 million in an account at the same bank. The account paid no interest and was essentially frozen, *i.e.*, the money was no longer accessible to Lottery and could not be used for any purpose until the line of credit was paid.  Lottery also paid a $300,000 origination fee and monthly interest.  Thus, rather than getting paid interest on its $30 million, Lottery ended up paying interest and a fee on a $30 million line of credit.

86.     DiMatteo, Clemenson, and Dickinson knew, or were reckless in not knowing, that the line of credit was contrary to the interests of Lottery and its shareholders.  The only purpose of

the line of credit was to create the false appearance that Lottery was continuing to grow both its revenues and assets.

87.    At the end of December 2021, the CEO of Company E sent numerous personal checks in various amounts (up to $30 million) to Lottery so that, prior to year end, Lottery would have "proof" of payment to show its auditor.  Lottery did not cash any of the checks for several weeks.

88.    In early January 2022, after obtaining the line of credit, Dickinson – with the knowledge and consent of DiMatteo and Clemenson – directed that the entire amount (minus a fee) be transferred to Company E.   Approximately two weeks later, Lottery cashed a $30 million personal check from Company E's CEO.  In effect, the $30 million purchase by and "payment" from Company E was a round-trip transaction, *i.e.,* Lottery used its own money to "pay" for the sale of over-priced, non-transferable advertising credits.  Nevertheless, because Lottery did not disclose the line of credit, Lottery appeared to have $30 million of additional cash when, in fact, nearly all of that cash was a loan.

### Following the Round-trip Transaction with Company E, Lottery Engaged in Two Other Sham Transactions with Company E to Boost Revenue

89.    The ruse involving the line of credit was important to Komissarov and the Lottery executives not only to show that Company E "paid" Lottery for the September 2021 sale, but also because Lottery needed additional (fake) revenue in Q4 FY 2021 to try to achieve Komissarov's revenue projections.   Based on information and belief, Lottery engaged in another phony transaction with Company E to support the stock price.

90.    In Q4 FY 2021, Lottery's actual revenues were modest.  At the end of December 2021, the Lottery executives, with Komissarov's knowledge, generated an invoice to Company E

for over $17.1 million, consisting largely of 4.33 million "free tickets", $1 million of advertising credits, and vaguely described information technology services.

91.    As with the purported sale of advertising credits in the sham transaction from September 2021, the credits in the December 2021 invoice were marked up to three times their face value.  At the same time that they created the December 2021 invoice, the Lottery executives arranged for the line of credit to conceal Company E's inability to pay for the earlier transaction. In addition, DiMatteo, Clemenson, and Dickinson knew at the time, or were reckless in not knowing, that Lottery had not provided $17.1 million of goods and services to Company E, and that Company E did not have the resources to pay $17.1 million.  Nevertheless, Lottery booked the entire amount as revenue for Q4 FY 2021.

92.    In early 2022, before any financial improprieties came to light, Lottery's board of directors awarded DiMatteo, Clemenson, and Dickinson retention bonuses of $227,740 each.  At the time, Lottery appeared to be increasing its revenues and assets as a result of the Defendants' fraudulent scheme and material misrepresentations about Lottery's financial results.  DiMatteo, who was the chairman of the board, did not inform the outside directors about the $30 million line of credit or that Lottery's cash holdings were overstated by $30 million.  Instead, during the first half of 2022, DiMatteo continued to tout Lottery's phony, inflated results in earnings releases and other public statements.

93.    In an earnings release on March 31, 2022, Lottery reported Q4 FY 2021 revenue of $21.5 million, which was falsely inflated by at least $17.1 million, and FY 2021 pro forma revenue of $70.5 million, which was overstated by at least $54 million.   In the release, DiMatteo commented on Lottery's "strong revenue growth and gross profit" and noted Lottery's intent to use the cash from the merger and the "$30 million received from the sale" to Company E to further

grow the business.  At the time he made the statements, DiMatteo knew, or was reckless in not knowing, that nearly 80% of Lottery's reported revenue was fake, the company had not had "strong revenue growth," and Lottery had not received $30 million in cash from a sale in 2021.

94.    On same day as the March 2022 earnings release, Lottery issued another invoice to Company E for over $18.5 million.  At the time, DiMatteo, Clemenson, and Dickinson knew, or were reckless in not knowing, that Company E had not paid for either of the two previous transactions totaling over $47 million.  DiMatteo, Clemenson, and Dickinson also knew at the time, or were reckless in not knowing, that Lottery had not provided $18.5 million of goods and services to Company E and that Company E could not pay $18.5 million.  Nevertheless, Lottery recorded the entire amount as revenue for Q1 FY 2022.

95.    In an earnings release on May 16, 2022, Lottery reported Q1 FY 2022 revenue of $21.2 million, which was falsely inflated by at least $18.5 million.  Lottery also claimed to have $7.7 million in adjusted EBITDA and $50.8 million in cash for the period ended March 31, 2022.  In fact, without the $18.5 million from the bogus invoice to Company E, Lottery's adjusted EDITDA would have been negative.  Moreover, Lottery's $50.8 million in cash was misleading because Lottery did not disclose the $30 million fully drawn line of credit.

96.    In the earnings release of May 16, 2022, DiMatteo touted "the [Lottery] team's continued focus on our core business and generating strong Adjusted EBITDA" and stated that the company's positive business developments "combined with our strong balance sheet, position us well for future growth." At the time that he made or authorized the making of these statements in the earnings release, DiMatteo knew, or was reckless in not knowing, that Lottery's revenue, adjusted EBITDA, and balance sheet information contained in the release were materially inflated.

***In Video Interviews Made Available to Investors, DiMatteo Touted the $30 Million Round-trip Transaction with Company E and Claimed that Lottery Collected the $30 Million***

97.     Following the de-SPAC, DiMatteo also talked up Lottery's financial performance and its purported sale of advertising credits to Company E and claimed that Lottery had collected the $30 million receivable from that sale. Specifically, in an interview with YogoNet posted online [at https://www.youtube.com/watch?v=H5CCimVTUnk], DiMatteo stated that "In Q3, we were able to sell some of those credits to one of our master affiliates at a premium . . . that's a revenue generating event for us." In the interview, DiMatteo also stated, "this is just the first step for us and we expect this to be a continuing piece of our business going forward . . . and it's really important for us as we move forward in our overall growth strategy."

98.     At the time he made the statements in the YogoNet interview, DiMatteo knew, or was reckless in not knowing, that his statements were false and misleading. In fact, the credits were not freely transferable, had restrictions on their use, and were not actually sold. In addition, DiMatteo knew or was reckless in not knowing that the sale "at a premium" was a sham and that the counterparty could not and did not pay Lottery.

99.     In an interview in early February 2022, DiMatteo claimed that Lottery had collected the $30 million from the bogus sale. When asked whether the receivables were collected, DiMatteo responded "they have" and deferred to Dickinson for additional detail. Later in the interview, DiMatteo maintained that Lottery had not adequately explained the transaction to investors who had raised concerns, and stated that "closing the Q3 [receivable] will help to sort of hopefully alleviate some of those concerns."

100.     At the time of the February 2022 interview, DiMatteo knew, or was reckless in not knowing, that Lottery had obtained a $30 million line of credit, which was immediately drawn down by Lottery and transferred (minus a fee) to the principal of Company E so that it could "pay"

Lottery.  DiMatteo knew, or was reckless in not knowing, that Lottery received no actual payment, incurred a $300,000 fee, and was making interest payments to maintain the fiction that the receivable was paid by Company E.

### Lottery's Periodic Filings with the Commission in 2022 Contained Material Misrepresentations

101.    On April 1, 2022, Lottery filed its Form 10-K for the year ending December 31, 2021, which contained the Company's financial statements and the audit report of its independent public accountants.  In the financial statements, Lottery included at least $54.1 million in phony revenue for 2021.  Lottery also overstated its cash by $30 million because the "payment" from Company E was, in fact, almost entirely money borrowed money from the undisclosed $30 million line of credit.  Lottery also did not include any disclosure of the line of credit as a subsequent event, the proceeds of which it provided to Company E to "pay" for the $30 million transaction of September 30, 2021.

102.    DiMatteo, Clemenson, and Dickinson each signed, or directed that their signatures be included on, the Form 10-K filing.  DiMatteo, Clemenson, and Dickinson each knew, or were reckless in not knowing, that the financial results in the Form 10-K were materially misstated with respect to Lottery's annual revenues, net income, cash, and assets.  They also knowingly or recklessly failed to disclose the line of credit as a material subsequent event.

103.    On May 16, 2022, Lottery filed its Form 10-Q for the quarter ending March 31, 2022.  In the unaudited financial statements in the Form 10-Q, Lottery included at least $18.5 million in phony revenue for the quarter.  Lottery also overstated its cash by $30 million because it did not disclose the $30 million line of credit.

104.    DiMatteo and Dickinson signed, or directed that their signatures be included on, the Form 10-Q filing.  At the time, DiMatteo and Dickinson knew, or were reckless in not knowing,

that the financial results in the Form 10-Q were materially misstated with respect to Lottery's quarterly revenues, net income, cash, and assets.

*Misrepresentations to the Auditors in the Management Representation Letter*

105. In connection with the audit of Lottery's financial statements for 2021, the independent auditor required DiMatteo and Dickinson to sign a management representation letter. Among other representations required by the auditor, the letter contained statements concerning the proper recording of material transactions, knowledge of fraud, arrangements affecting reported revenue, and the validity of receivables.

106. On or about March 31, 2022, DiMatteo and Dickinson signed the management representation letter. In the letter, which the auditors relied upon, DiMatteo and Dickinson falsely represented, among other things, that (i) they believed the financial statements conformed with GAAP; (ii) "there were no material transactions that have not properly been recorded" in the company's records; (iii) they had no knowledge of fraud; (iv) there were no "arrangements (either written or oral) that affect the amount or timing revenue reported; and (v) receivables recorded were valid claims against debtors. The letter also stated: "No events have occurred subsequent to the balance sheet date and through the date of this letter that would require adjust to, or disclosure in, the consolidated financial statements."

107. DiMatteo and Dickinson knew, or were reckless in not knowing, that their representations in the letter to the auditors were false or misleading. Specifically, DiMatteo and Dickinson knew, or were reckless in not knowing, that (i) the financial statements did not comply with GAAP because they contained at least $54 million of revenue (of the $68.5 million in total revenue) that was fake as a result of the sham transaction with Company A in late 2020 and two phony transactions with Company B at the end of the third and fourth quarters of 2021; (ii) the

phony revenue transactions and the amount of consideration paid for the acquisition of the Mexican entities were not properly recorded in Lottery's accounting records; (iii) Lottery had engaged in fraudulent transactions, in which they were involved; (iv) Lottery had arrangements with Company A and Company B that impacted revenue; and (iv) Lottery's receivables included the second phony transaction with Company B.

### False Certifications by DiMatteo and Dickinson

108.    On or about March 31, 2022, DiMatteo and Dickinson certified that they had reviewed Lottery's Form 10-K and that, among other things, (i) based on their knowledge, the Form 10-K did not contain any untrue statement of a material fact or omit to state a material fact necessary to make the statements made, in light of the circumstances under which such statements were made, not misleading; (ii) based on their knowledge, the financial statements, and other financial information included in the report, fairly presented in all material respects the financial condition, results of operations and cash flows of Lottery and (iii) they had designed internal control over financial reporting, or caused such internal control over financial reporting to be designed, to provide reasonable assurance regarding the reliability of financial reporting and the preparation of financial statements for external purposes in accordance with GAAP.  DiMatteo and Clemenson knew, were reckless in not knowing, or should have known that their certifications were false.

109.    On or about March 31, 2022, pursuant to Rule 13a-14 of the Exchange Act, DiMatteo and Dickinson also certified that the information contained in the Form 10-K fairly presented, in all material respects, the financial condition and results of operations of the Company. At the time, DiMatteo and Dickinson knew, were reckless in not knowing, or should have known that their certifications were false.

***Lottery Ultimately Disclosed Some of the Material Misstatements in its Financial Statements***

110.    In or around July 2022, Lottery's board became aware of financial improprieties and discovered, among other things, the $30 million line of credit.  The Board terminated Dickinson, and Clemenson and DiMatteo resigned shortly thereafter.  In or around August 2022, Lottery ceased operations and furloughed nearly all of its employees.

111.    Lottery's market capitalization peaked at over $400 million after the de-SPAC, declined in 2022, and, after the company disclosed accounting issues and halted operations, fell to roughly $10 million.  Investors suffered substantial losses as a result of the Defendants' misconduct.

112.    On May 9, 2023, Lottery restated its financial results for FY 2021 to remove the phony transactions of September 30, 2021 ($30 million in revenue) and December 31, 2021 ($17.1 million in revenue).  Lottery also restated its financial results for its first quarter of FY 2022 to remove $18.5 million in fake revenue for the invoice of March 31, 2022.

### FIRST CLAIM FOR RELIEF
### Violations of Section 10(b) of the Exchange Act and Rule 10b-5
### [15 U.S.C. § 78j(b) and 17 C.F.R. § 240.10b-5]

113.    Paragraphs 1 through 112 are realleged and incorporated by reference herein.

114.    Lottery, Komissarov, DiMatteo, Clemenson, and Dickinson, directly or indirectly, in connection with the purchase or sale of a security, by the use of means or instrumentalities of interstate commerce, of the mails, or of the facilities of a national securities exchange, with scienter: employed devices, schemes, or artifices to defraud; made untrue statements of material facts, or omitted to make statements made, in light of the circumstances under which they were made, not misleading, and engaged in acts, practices, or courses of business which operated or would operate as a fraud or deceit upon other persons.

115. By engaging in the conduct described above, Lottery, Komissarov, DiMatteo, Clemenson, and Dickinson violated, and unless restrained and enjoined will again violate, Section 10(b) of the Exchange Act [15 U.S.C. § 78j(b)] and Rule 10b-5 thereunder [17 C.F.R. §§ 240.10b-5].

## SECOND CLAIM FOR RELIEF
### Aiding and Abetting Violations of Section 10(b) of the Exchange Act and Rule 10b-5
### [15 U.S.C. § 77q(a) and 17 C.F.R. § 240.10b-5(b)]

116. Paragraphs 1 through 112 are realleged and incorporated by reference herein.

117. Lottery, both as the entity formerly operating as Autolotto, Inc. and as the entity that was renamed following the Trident SPAC merger, directly or indirectly, in connection with the purchase or sale of a security, by the use of means or instrumentalities of interstate commerce, of the mails, or of the facilities of a national securities exchange, with scienter: employed devices, schemes, or artifices to defraud, made untrue statements of material facts, or omitted to state material facts necessary in order to make the statements made, in the light of the circumstances under which they were made, not misleading; and engaged in acts, practices, or courses of business which operated or would operate as a fraud or deceit upon other persons.

118. By engaging in the conduct described above, and pursuant to Section 20(e) of the Exchange Act [15 U.S.C. § 78t(e)], DiMatteo, Clemenson, and Dickinson knowingly or recklessly provided substantial assistance to, and thereby aided and abetted Lottery's violations of Section 10(b) of the Exchange Act [15 U.S.C. § 78j(b)], and Rule 10b-5 thereunder [17 C.F.R. §§ 240.10b-5].

119. By engaging in the conduct described above, DiMatteo, Clemenson, and Dickinson aided and abetted Lottery's violations, and unless restrained and enjoined will again aid and abet

violations of Section 10(b) of the Exchange Act [15 U.S.C. § 78j(b)], and Rule 10b-5 thereunder [17 C.F.R. §§ 240.10b-5].

**THIRD CLAIM FOR RELIEF**
**Section 17(a) of the Securities Act**
**[15 U.S.C. § 77q(a)]**

120.    Paragraphs 1 through 112 are realleged and incorporated by reference herein.

121.    Lottery, Komissarov, DiMatteo, Clemenson, and Dickinson, acting knowingly, recklessly, or negligently in the offer or sale of securities and by the use of means or instruments of transportation or communication in interstate commerce or by the use of the mails, directly or indirectly

      a.   employed a device, scheme, or artifice to defraud;

      b.   obtained money or property by means of untrue statements of material fact or by omitting to state material facts necessary in order to make the statements made, in light of the circumstances under which they were made, not misleading;

      c.   engaged in transactions, practices, or a course of business which operated or would have operated as a fraud or deceit upon purchasers; and

122.    By engaging in the conduct described above, Lottery, Komissarov, DiMatteo, Clemenson, and Dickinson violated, and unless restrained and enjoined will again violate, Section 17(a) of the Securities Act [15 U.S.C. §77q(a)].

**FOURTH CLAIM FOR RELIEF**
**Aiding and Abetting Violations of Section 17(a) of the Securities**
**[15 U.S.C. § 77q(a)]**

123.    Paragraphs 1 through 112 are realleged and incorporated by reference herein.

124.    Lottery, both as the entity formerly operating as Autolotto, Inc.  and as the entity that was renamed following the Trident SPAC merger, acting knowingly, recklessly, or negligently

38

in the offer or sale of securities and by the use of means or instruments of transportation or communication in interstate commerce or by the use of the mails, directly or indirectly

    a.   employed a device, scheme, or artifice to defraud;

    b.   obtained money or property by means of untrue statements of material fact or by omitting to state material facts necessary in order to make the statements made, in light of the circumstances under which they were made, not misleading;

    c.   engaged in transaction, practices, or a course of business which operated or would have operated as a fraud or deceit upon purchasers

125.    By engaging in the conduct described above, and pursuant to Section 15(b) of the Securities Act [15 U.S.C. §77o(b)], DiMatteo, Clemenson, and Dickinson knowingly or recklessly provided substantial assistance to, and thereby aided and abetted Lottery's violations of Section17(a) of the Securities Act [15 U.S.C. § 77q(a)].

126.    By engaging in the conduct described above, DiMatteo, Clemenson, and Dickinson aided and abetted Lottery's violations, and unless restrained and enjoined will again aid and abet violations of Section 17(a) of the Securities Act [15 U.S.C. § 77q(a)].

**FIFTH CLAIM FOR RELIEF**
**Section 14(a) of the Securities Act and Rule 14a-9 thereunder**
**[15 U.S.C. § 78n(a)]**

127.    Paragraphs 1 through 112 are realleged and incorporated by reference herein.

128.    Lottery, Komissarov, DiMatteo, Clemenson, and Dickinson, acting knowingly, recklessly, or negligently in soliciting, or permitting the use of their names to solicit, proxies that included materially false or misleading statements or materially misleading omissions.

129.    By engaging in the conduct described above, Lottery, Komissarov, DiMatteo, Clemenson, and Dickinson violated, and unless restrained and enjoined will again violate, Section 14(a) of the Securities Act [15 U.S.C. § 77q(a)] and Rule 14a-9 thereunder [C.F.R. § 240.14a-9].

### SIXTH CLAIM FOR RELIEF
**Aiding and Abetting Violations of
Section 14(a) of the Securities Act and Rule 14a-9 thereunder
[15 U.S.C. § 78n(a)]**

130.    Paragraphs 1 through 112 are realleged and incorporated by reference herein.

131.    Lottery acting knowingly, recklessly, or negligently in soliciting, or permitting the use of its name to solicit, proxies that included materially false or misleading statements or materially misleading omissions.

132.    By engaging in the conduct described above, and pursuant to Section 20(e) of the Securities Act [15 U.S.C. § 78t(e)], DiMatteo, Clemenson, and Dickinson knowingly or recklessly provided substantial assistance to, and thereby aided and abetted Lottery's violations of Section14(a) of the Securities Act [15 U.S.C. § 78n(a)].

133.    By engaging in the conduct described above, DiMatteo, Clemenson, and Dickinson aided and abetted Lottery's violations, and unless restrained and enjoined will again aid and abet violations of Section 14(a) of the Securities Act [15 U.S.C. § 78n(a)] and Rule 14a-9 thereunder [C.F.R. § 240.14a-9].

### SEVENTH CLAIM FOR RELIEF
**Knowingly Falsifying Books, Records, or Accounts: Section 13(b)(5) of the Exchange Act
[15 U.S.C. § 78m(b)(5)]**

134.    Paragraphs 1 through 112 are realleged and incorporated by reference herein.

135.    DiMatteo, Clemenson, and Dickinson knowingly circumvented or knowingly failed to implement a system of internal accounting controls or knowingly falsified books, records, or

accounts that Lottery was required to maintain under Section 13(b)(2) of the Exchange Act [15 U.S.C. § 78m(b)(2)].

136.    By engaging in the conduct described above, DiMatteo, Clemenson, and Dickinson violated, and unless restrained and enjoined will again violate, Section 13(b)(5) of the Exchange Act [15 U.S.C. § 78m(b)(5)].

## EIGHTH CLAIM FOR RELIEF
### Falsified Books, Records, or Accounts: Rule 13b2-1 of the Exchange Act
### [17 C.F.R. § 240.13b2-1]

137.    Paragraphs 1 through 112 are realleged and incorporated by reference herein.

138.    DiMatteo, Clemenson, and Dickinson, directly or indirectly, falsified or caused to be falsified Lottery's books, records, or accounts subject to Section 13(b)(2)(A) of the Exchange Act [15 U.S.C. § 78m(b)(2)(A)].

139.    By engaging in the conduct described above and acting knowingly, recklessly, or negligently, DiMatteo, Clemenson, and Dickinson violated, and unless restrained and enjoined will again violate, Rule 13b2-1 of the Exchange Act [17 C.F.R. § 240.13b2-1].

## NINTH CLAIM FOR RELIEF
### Lying to Accountants: Rule 13b2-2 of the Exchange Act
### [17 C.F.R. § 240.13b2-2]

140.    Paragraphs 1 through 112 are realleged and incorporated by reference herein.

141.    DiMatteo and Dickinson, directly or indirectly: (a) made or caused to be made materially false or misleading statements to accountants; or (b) omitted to state, or caused another person to omit to state, material facts necessary in order to make statements made, in light of the circumstances under which such statements were made, not misleading, to accountants in connection with (1) an audit, review, or examination of financial statements required by the

Exchange Act or rules thereunder; or (2) the preparation or filing of a document or report required to be filed with the Commission.

142.    By engaging in the conduct described above and acting knowingly or recklessly, or negligently, DiMatteo and Dickinson violated, and unless restrained and enjoined will again violate, Rule 13b2-2 of the Exchange Act [17 C.F.R. § 240.13b2-2].

**TENTH CLAIM FOR RELIEF**
**False Certifications: Rule 13a-14 of the Exchange Act**
**[17 C.F.R. § 240.13a-14]**

143.    Paragraphs 1 through 112 are realleged and incorporated by reference herein.

144.    DiMatteo and Dickinson, as Lottery's CEO and CFO, respectively, signed certifications required by Rule 13a-14 of the Exchange Act [17 C.F.R. § 240.13a-14] for Lottery's Form 10-K for fiscal year 2021, and Form 10-Q for the first quarter of Lottery's fiscal year 2022, even though they knew or were reckless in not knowing that both filings contained material misrepresentations concerning Lottery's revenue and other financial results.

145.    By engaging in the conduct described above and acting knowingly, recklessly, or negligently, DiMatteo and Dickinson violated, and unless restrained and enjoined will again violate, Rule 13a-14 of the Exchange Act [17 C.F.R. § 240.13a-14].

**ELEVENTH CLAIM FOR RELIEF**
**Reporting Violations: Lottery's Violations of Section 13(a) and**
**Rules 12b-20, 13a-1, and 13a-11, and 13a-13 of the Exchange Act**
**[15 U.S.C. § 78m(a), 17 C.F.R. §§ 240.12b-20, 240.13a-1, 240.13a-11 and 240.13a-13]**

142.    Paragraphs 1 through 112 are realleged and incorporated by reference herein.

143.    Lottery violated Section 13(a) of the Exchange Act [15 U.S.C. § 78m(a)] and Rules 12b-20 and 13a-1 thereunder [17 C.F.R. §§ 240.12b-20 and 240.13a-1] by filing with the Commission on April 1, 2022, a materially false and misleading annual report on Form 10-K. Lottery violated Rules 12b-20 and 13a-11 of the Exchange Act [17 C.F.R. §§ 240.12b-20 and

240.13a-11] by filing with the Commission false and misleading current reports on Forms 8-K, reporting false and misleading financial results on November 15, 2021, March 31, 2022, and May 16, 2022.  Lottery also violated Rules 12b-20 and 13a-13 of the Exchange Act [17 C.F.R. §§ 240.12b-20 and 240.13a-13] by filing with the Commission on May 16, 2022, a false and misleading quarterly report on Form 10-Q, reporting false and misleading financial results.

144.    By engaging in the conduct described above, Lottery violated, and unless restrained and enjoined will again violate, Section 13(a) and Rules 12b-20, 13a-1, and 13a-11, and 13a-13 of the Exchange Act [15 U.S.C. § 78m(a), 17 C.F.R. §§ 240.12b-20, 240.13a-1, 240.13a-11 and 240.13a-13].

### TWELFTH CLAIM FOR RELIEF
**Reporting Violations: Aiding and Abetting Lottery's Violations of Section 13(a) and Rules 12b-20, 13a-1, and 13a-11, and 13a-13 of the Exchange Act [15 U.S.C. § 78m(a) and 17 C.F.R. §§ 240.12b-20, 240.13a-1, 240.13a-11 and 240.13a-13]**

145.    Paragraphs 1 through 112 are realleged and incorporated by reference herein.

146.    Lottery violated Section 13(a) of the Exchange Act [15 U.S.C. § 78m(a)] and Rules 12b-20 and 13a-1 thereunder [17 C.F.R. §§ 240.12b-20 and 240.13a-1] by filing with the Commission on April 1, 2022, a materially false and misleading annual report on Form 10-K. Lottery violated Rules 12b-20 and 13a-11 of the Exchange Act [17 C.F.R. §§ 240.12b-20 and 240.13a-11] by filing with the Commission false and misleading current reports on Forms 8-K, reporting false and misleading financial results on November 15, 2021, March 31, 2022, and May 16, 2022.  Lottery also violated Rules 12b-20 and 13a-13 of the Exchange Act [17 C.F.R. §§ 240.12b-20 and 240.13a-13] by filing with the Commission on May 16, 2022, a false and misleading quarterly report on Form 10-Q, reporting false and misleading financial results.

147.    DiMatteo, Clemenson, and Dickinson knowingly or recklessly provided substantial assistance to Lottery's violations of Section 13(a) of the Exchange Act [15 U.S.C. §

78m(a)], and Rules 12b 20, 13a-1, 13a-11, and 13a-13 thereunder [17 C.F.R. §§ 240.12b-20, 240.13a-1, 240.13a-11, and 240.13a-13].

148.    By engaging in the conduct described above, and pursuant to Section 20(e) of the Exchange Act [15 U.S.C. § 78t(e)], DiMatteo, Clemenson, and Dickinson aided and abetted Lottery's violations, and unless restrained and enjoined, will again aid and abet violations, of Section 13(a) of the Exchange Act [15 U.S.C. § 78m(a)], and Rules 12b-20, 13a-1, and 13a-11, and 13a-13 thereunder [17 C.F.R. §§ 240.12b-20, 240.13a-1, 240.13a-11, and 240.13a-13].

## THIRTEENTH CLAIM FOR RELIEF
### Internal Controls / Recordkeeping: Lottery's Violations of
### Section 13(b)(2)(A) and (B) of the Exchange Act
### [15 U.S.C. §§ 78m(b)(2)(A)-(B)]

149.    Paragraphs 1 through 112 are realleged and incorporated by reference herein.

150.    Lottery violated Section 13(b)(2)(A) of the Exchange Act [15 U.S.C. § 78m(b)(2)(A)] by failing to make or keep books, records and accounts that in reasonable detail accurately and fairly reflected its transactions and disposition of its assets.  Lottery also violated Section 13(b)(2)(B) of the Exchange Act [15 U.S.C. § 78m(b)(2)(B)] by failing to devise and maintain a system of internal accounting controls sufficient to provide reasonable assurances that transactions were recorded as necessary to permit preparation of financial statements in conformity with GAAP and to maintain accountability of assets.

151.    By engaging in the conduct described above, Lottery violated, and unless restrained and enjoined will again violate, Section 13(b)(2)(A) and 13(b)(2)(B) of the Exchange Act [15 U.S.C. §§ 78m(b)(2)(A) and 78m(b)(2)(A)].

## FOURTEENTH CLAIM FOR RELIEF
### Internal Controls / Recordkeeping: Aiding and Abetting Lottery's Violations of Section 13(b)(2)(A) and (B) of the Exchange Act
### [15 U.S.C. §§ 78m(b)(2)(A)-(B)]

152.    Paragraphs 1 through 112 are realleged and incorporated by reference herein.

153.    Lottery violated Section 13(b)(2)(A) of the Exchange Act [15 U.S.C. § 78m(b)(2)(A)] by failing to make or keep books, records and accounts that in reasonable detail accurately and fairly reflected its transactions and disposition of its assets.  Lottery also violated Section 13(b)(2)(B) of the Exchange Act [15 U.S.C. § 78m(b)(2)(B)] by failing to devise and maintain a system of internal accounting controls sufficient to provide reasonable assurances that transactions were recorded as necessary to permit preparation of financial statements in conformity with GAAP and to maintain accountability of assets.

154.    DiMatteo, Clemenson, and Dickinson knowingly or recklessly provided substantial assistance to Lottery's violations of Sections 13(b)(2)(A) and 13(b)(2)(B) of the Exchange Act [15 U.S.C. §§ 78m(b)(2)(A)-(B)].

155.    By engaging in the conduct described above and pursuant to Section 20(e) of the Exchange Act [15 U.S.C.  § 78t(e)], DiMatteo, Clemenson, and Dickinson aided and abetted Lottery's violations, and unless enjoined will again aid and abet violations, of Sections 13(b)(2)(A) and 13(b)(2)(B) of the Exchange Act [15 U.S.C. §§ 78m(b)(2)(A)-(B)].

## PRAYER FOR RELIEF

**WHEREFORE**, the Commission respectfully requests that the Court:

A.      Permanently enjoin Defendants and all persons in active concert or participation with them from violating the federal securities laws as alleged in this Complaint;

B.      Permanently enjoin DiMatteo, Clemenson, and Dickinson, and all persons in active concert or participation with them, from aiding and abetting violations of Sections 13(a), 13(b)(2)(A), and 13(b)(2)(B) of the Exchange Act [15 U.S.C. § 78m(a), 78m(b)(2)(A)-(B)]] and Rules 12b-20, 13a-1, 13a-11, and 13a-113 thereunder [17 C.F.R. §§ 240.12b-20, 240.13a-1, 240.13a-11 and 240.13a-13];

C.      Order that Komissarov, DiMatteo, Clemenson, Dickinson, and Lottery, pursuant to Sections 21(d)(3), (d)(5), and (d)(7) of the Exchange Act [15 U.S.C. §§ 78u(d)(3), (5), and (7)], disgorge their ill-gotten gains obtained as a result of the violations alleged in this Complaint, with prejudgment interest;

D.      Order that Komissarov, DiMatteo, Clemenson, Dickinson, and Lottery, pursuant to Section 20(d) of the Securities Act [15 U.S.C. § 77t(d)] and Section 21(d)(3) of the Exchange Act [15 U.S.C. § 78u(d)(3)], pay civil penalties in an amount to be determined by the Court;

E.      Order that Komissarov, DiMatteo, Clemenson, and Dickinson be barred from acting as officers or directors of any issuer that has a class of securities registered pursuant to Exchange Act Section 12 [15 U.S.C. § 78l] or that is required to file reports pursuant to Exchange Act Section 15(d) [15 U.S.C. § 78o(d)]; and

F.      Grant such further relief as the Court may deem just and appropriate.

## REQUEST FOR JURY TRIAL

The Commission hereby demands a jury trial.

Dated: January 22, 2026

Respectfully submitted,

/s/ Damon W.  Taaffe
Damon W. Taaffe (*pro hac vice* to be filed)
U.S. Securities and Exchange Commission
100 F Street, N.E.
Washington, DC 20549 Tel: (202) 551-7420
taaffed@sec.gov